STATE of Tennessee ex rel. Robert F. SMITH, Commissioner, Department of Transportation, Petitioner-Plaintiff,

v.

J. H. OVERSTREET, Respondent-Defendant.

Supreme Court of Tennessee.

Feb. 2, 1976.

R. A. Ashley, Jr., Atty. Gen., Russell G. Lazenby, Asst. Atty. Gen., Nashville, J. H. Reneau, III, Sp. Trial Counsel, Celina, for petitioner-plaintiff.

T. Eugene Jared, T. Michael O'Mara, Cookeville, for respondent-defendant.

## OPINION

HARBISON, Justice.

This action was instituted as a condemnation proceeding for a highway project in

Clay County, Tennessee, pursuant to T.C.A. §§ 23–1528 et seq. Some 350 acres of land fronting approximately one mile on the northerly side of the highway to be widened were involved in the condemnation proceedings, although the area actually taken was approximately 22.64 acres. Portions of the tract were under lease to different tenants, and the case presently before the Court involves the appropriate measure of damages for moving expenses claimed by one of these tenants, J. H. Overstreet. All claims of the landowners and of the other tenants have been disposed of.

Respondent, Mr. Overstreet, operated a sawmill on approximately six acres of land which he leased from the owner, Beverly Minor Marcom; in addition, he stored lumber on some three or four additional acres which he held under a separate leasing arrangement hereinafter referred to. Respondent had erected a number of sheds and other buildings on the six-acre tract, in which were housed the sawmill machinery and equipment and in which were conducted the milling operations.

At the trial of the condemnation case the respondent was awarded damages for the loss of his leasehold and for the leasehold improvements, these being separately reported in the jury verdict. He also claimed and was awarded substantial damages for moving expenses. These were not itemized in the verdict, but they included expenses which had already been incurred by the respondent in the dismantling and removal of his machinery and equipment, its storage, and estimated costs of reinstallation. Evidence was also introduced by the respondent, over objection of the State, as to estimated costs of removing a large inventory of lumber and logs stored on the six-acre tract and the adjacent three or four acres; alternative evidence was offered as to the loss in value of this lumber by reason of its having been sold, rather than moved, respondent claiming that he was entitled to damages for the "involuntary conversion" of his stock in trade.

There are no assignments of error and no issues made here by either party as to the jury verdict concerning the leasehold and leasehold improvements. The Court of Appeals held that error had been committed in the award for moving expenses, and ordered a new trial as to that issue only. We regard this as a proper procedural disposition of the matter, inasmuch as the evidence concerning moving expenses is not inextricably combined with or dependent upon the evidence as to loss of leasehold value or improvements.

While we agree with the Court of Appeals that evidence offered by the respondent was improperly received and that a new trial must be had on the item of moving expenses, we are not in agreement with its holding as to the type of evidence which may be offered on the new trial. In order to place the issue in proper perspective, some discussion of the facts and the applicable law is necessary.

The leasing arrangement by which respondent held both the six acres and the adjacent three or four-acre tract was tenuous and was proved in a most indefinite manner. As to the three or four acres, there was no evidence whatever, other than the statement of Mr. Overstreet that he held this under an "oral lease", presumably with Mr. Marcom. The terms of this lease are not mentioned at all in the evidence, and, insofar as the record appears, Mr. Overstreet could have been forced to remove his lumber from this area at almost any time. Whether the lease was from month to month, or from quarter to quarter, does not appear, although in Mr. Marcom's testimony there is some reference to the fact that the parties negotiated every quarter for rent. At most, it appears that this was a very short term and indefinite arrangement, so much so that the tenant did not claim any loss of leasehold value by reason of having to vacate this tract.

As to the six-acre tract, the proof was likewise extremely indefinite and sketchy, to the point that the jury returned and

asked specifically what rent was being paid by the tenant under his lease. Originally there was a written lease between Mr. Overstreet and the mother of Mr. Marcom, for a term of one year beginning March 1, 1964 and ending March 1, 1965. There were provisions in this written lease under which the tenant could, by giving written notice, extend the lease for additional periods of one year each, but in no event later than March 1, 1974. The testimony, however, is uncontradicted that no such written notice had ever been given by Mr. Overstreet, so that technically the written lease had expired in 1965. Thereafter Mr. Overstreet was simply holding under an oral arrangement with Mr. Marcom, the terms and conditions of which are entirely undeveloped in the proof. The original written lease called for rent at the rate of $40 per month, for the entire six acres, but the testimony of the parties was that at the date of taking, September 27, 1971, rent was being paid at the rate of $100 per month. How many more months the tenant had to remain in possession under this tenuous arrangement is not clear, although it is apparent that the landowner felt that the tenant, at most, could not have remained in possession beyond March 1, 1972 without further negotiations. The tenant, however, claimed a right to remain in possession through March 1, 1974, and predicated his claim for loss of leasehold value on that period; that is, the tenant contended that he was entitled to remain in possession for an additional thirty months after the date of taking. Since the jury allowed him a substantial award for loss of leasehold value, which is not questioned here, the jury must have accepted the claim of the tenant, insofar as the State was concerned. From a strictly legal standpoint, however, based upon the evidence presently in the record, it is doubtful that the tenant could have enforced a right of possession against his landlord beyond March 1, 1972, approximately five months from the date of taking, and the landlord's counsel pointed out that the tenant would have had to move his inventory at the expiration of his lease unless there were further negotiations between the parties.

The fragile nature of the tenancy is relevant to the claim of moving expenses. The tenant did dismantle the sawmill and its machinery, but did not relocate it, claiming that he had never found another suitable site for his milling operation. He testified that he had actually expended about $2500 in dismantling and storing the machinery and equipment, but claimed a total of $35,000 in moving expenses for the machinery and equipment, contending that it would cost this much in labor and materials to dismantle the sawmilling operation, move and reinstall the equipment. Cross-examination of the tenant revealed a number of weaknesses and discrepancies in this testimony, but no contrary evidence was offered by the State. As stated, the date of taking was September 27, 1971. The trial occurred over two years later, November 19 and 20, 1973. The record is silent, however, as to when the sawmill machinery and equipment were actually dismantled and placed in storage. The testimony of the respondent left the decided inference that he intended to re-enter the sawmilling business, and he made a claim for expenses in connection with the laying of concrete footings, electrical wiring and other expenses incident to re-installation of his equipment. The record, however, is extremely meager as to whether he in fact did have any definite plans to re-enter the business and as to whether these expenses in fact would ever be incurred.

On the date of taking Mr. Overstreet had stored on the six-acre tract and the adjacent tract approximately 300,000 board feet of logs and approximately 1,500,000 board feet of hardwood lumber. The testimony was that green, or unseasoned, lumber sells on the market for substantially less than seasoned lumber of this type, which is primarily used in the manufacture of furniture. The testimony also showed that the optimum period for air drying, or seasoning, of lumber, prior to its being kiln-dried, cov-

ers a period of several months, averaging about six months. It is contended that on the date of taking there was some seasoned lumber in the various stacks on the premises, but a great deal of green lumber, in all stages of drying, and that the maximum value could have been derived from this inventory only by its being held until it had become fully seasoned.

Respondent elected not to incur the cost of moving this large inventory of lumber to a new site, but rather sold it at the site to other persons in the lumber business. The terms of these sales are not shown in the record, and there is no testimony whatever as to when the sales occurred, or as to what arrangements, if any, had been made by the tenant with the State for remaining on the premises after the date of taking. The tenant did remain in possession for some period of time after the date of taking, although the date is not shown, because his witnesses testified to having inspected the premises during the month of October 1971.[1] It was the claim of the tenant, however, that he was forced either to move the inventory of lumber or to sell it, and it is the argument of his counsel, although not demonstrated by evidence, that he was not granted sufficient time by the State to permit the lumber to season and be sold at its highest value. It is thus claimed that there was an "involuntary conversion" of the lumber, and the tenant claimed damages for moving expenses of the lumber, which were never incurred, or alleged loss of the value of the inventory, whichever was less. He was permitted to offer evidence to the jury, over objection of the State, and the testimony conclusively showed that the alleged loss in value was greater than the alleged cost of moving, so that the ultimate claim rested upon the claimed moving expenses.

The issue, of course, is whether or not one can recover for moving expenses under the Tennessee statute when in fact such expenses were never actually incurred and never would be incurred.

■ The Court of Appeals concluded, properly in our opinion, that the Tennessee statutes do not allow any claim for loss of profits, or for damages for an alleged involuntary conversion of a stock in trade. The Court of Appeals was of the opinion, however, that the tenant elected to sell his inventory rather than move it, because the State did not pay into court enough money to cover the moving expenses. There is no testimony to this effect in the record from any witness. There is nothing but argument of counsel in support of any such contention, wholly unsupported in the record, and we believe that the Court of Appeals was in error in concluding that the sale made by the tenant was in any way the result of an alleged inadequate initial deposit by the State.

The facts in connection with the deposit are uncontradicted. Initially the State paid into court an estimated sum for the damages of the landowners, but a separate and itemized estimate as to the tenant, Mr. Overstreet. Its initial deposit included $5000 to Mr. Overstreet for damages to his leasehold and $6500 labeled as moving expenses. Thereafter, and within a short time, the State paid an additional $13,000 into court for the benefit of Mr. Overstreet, making a total deposit of $24,500. Mr. Overstreet immediately withdrew all of these funds without prejudice, as authorized by statute. He filed no other pleadings in the case at any time. His withdrawals occurred in September 1971, and at no time did he testify or suggest that he concluded to sell his inventory, rather than move it, because of lack of funds or inadequate payment on the part of the State. At the trial Mr. Overstreet received $15,042.25 from the jury as the award for damages to his leasehold and leasehold improvements—a sum substantially less than the amount paid in

1. As to another tenant involved in the same proceedings, an order of possession was not entered until April 7, 1972.

by the State for these items. Had it not been for his moving expenses, Mr. Overstreet would have had to make a refund to the State, insofar as the claim for leasehold and leasehold improvements was concerned.

There is no testimony either from Mr. Overstreet or from any representative of the State as to how the estimates made by the State were arrived at, as to why an additional deposit was made, or as to whether the State had any information about Mr. Overstreet's decision to sell his inventory rather than move it. As previously pointed out, Mr. Overstreet's testimony was that his decision to sell was based upon lack of time to permit the lumber to season, rather than any financial hardship by reason of an inadequate deposit. Accordingly we are not in agreement with the ruling made by the Court of Appeals that upon retrial Mr. Overstreet may be permitted to recover the estimated costs of removal if he can prove that his decision to sell was based upon lack of an adequate deposit by the State.

We agree with the Court of Appeals, and the State itself concedes, that State officials should make a good faith estimate of damages and expenses when making initial deposits into court. We further agree that if the matter is timely raised by the landowner, the trial judge might cause some inquiry to be made as to whether the State had or had not exercised good faith in connection with its estimate. Nothing of this sort occurred in the present case, however, and at no time, by pleadings or testimony, did respondent ever suggest in the trial court that he was forced to sell his inventory because the State had not paid in enough funds to enable him to bear the expense of moving.[2] Since this was never made an issue during the trial of the case, we are of the opinion that the Court of Appeals was in error in holding that such an issue could be made or developed upon the remand and new trial.

Prior to 1951, there was no provision in the Tennessee condemnation statutes for the cost of the removal of personal property or fixtures in condemnation proceedings. Cases decided prior to that date made it clear that the constitutional requirements of just compensation to a property owner did not embrace damages for such removal, or for loss of value in connection with such removal. See *Lenzi v. Memphis Union Station Company*, 3 Tenn.Civ.App. 218 (1913). Provision was first made for the payment of moving expenses by Chapter 176 of the Public Acts of 1951. As codified in T.C.A. § 23–1414, the statute provided, at the time of the taking in question here:

"Where the removal of furniture, household belongings, fixtures, equipment, machinery, or stock in trade is made necessary by the taking, the reasonable expense of such removal shall be considered in assessing incidental damages. The reasonable expense of the removal of such chattels shall be construed as including the cost of: any necessary disconnection, dismantling or disassembling, the loading, and drayage to another location not more than ten (10) miles distant, and the reassembling, re-connecting, and installing in such new location."

It is clear that the moving expenses here provided are classified as incidental damages only, and not as part of the value of property actually taken. The 1951 statute, as amended, has been construed in several reported cases in this state.

In the case of *Knoxville Housing Authority, Inc. v. Bush*, 56 Tenn.App. 464, 408 S.W.2d 407 (1966), the Court held that the statutes providing for incidental damages to a landowner did not permit reimbursement to a property holder of a prepayment penalty on a mortgage, made necessary by the condemnation. The Court said:

"From the above authorities, it is evident that all pecuniary losses suffered by

2. One witness testified that the inventory value at date of taking was in excess of $175,000.

a landowner as the result of an eminent domain proceeding are not compensable, but only those damages which are embraced within the eminent domain statutes. These damages, as shown above, are those relating to the part of the land remaining to a landowner after a part of his land has been taken for a public improvement, and the reasonable expense of removing furniture, household belongings, fixtures, equipment or machinery made necessary by the taking of the property, as defined in T.C.A. 23–1414 above. A mortgage prepayment penalty does not fit either category, and therefore cannot be recovered." 56 Tenn.App. at 470, 408 S.W.2d at 410.

The Court further stated:

"The appellate courts of this state have held consistently that incidental damages are a creature of statute and can be awarded only where the pecuniary injury to the condemnee is embraced within the legislative enactments." 56 Tenn.App. at 471, 408 S.W.2d at 410.

In the case of *Thompson Brothers Investment Company v. State ex rel. Pack*, 60 Tenn.App. 92, 444 S.W.2d 180 (1969), a claim was made for the moving expenses of certain ice manufacturing machinery in connection with condemnation proceedings. The property on which the machinery was actually situated was not taken, but merely an adjacent part of the tract. The proof showed that there was no intention on the part of the landowners to move the machinery in question, and it was not in fact moved.

After quoting the provisions of T.C.A. § 23–1414 above set out, the Court said:

"Under the above quoted statute, it will be noted that the removal expenses are recoverable only where such expenses are, '*made necessary by the taking*.' It is obvious in the instant case that the taking of part of the property, on which part the ice machinery in question was not located, did not *make necessary* the removal of the ice machinery from that

part of the property not taken. The ice machinery in question had been there, unmoved since 1958, and Mr. Vance Maynard Thompson testified that his family had no intention of moving the ice machinery in question except for the purpose of sale. . . . Obviously a sale of the machinery can be made from where it is now (undisturbed by the condemnation proceeding), just as well as could be made from any other location within ten miles of its present location. In spite of information of the taking furnished to defendant in 1959, it had not moved the machinery up to now and there is no good reason for assuming or adjudicating that the taking involved in the instant case has made necessary its removal *within any foreseeable future*." 60 Tenn.App. at 98, 444 S.W.2d at 183.

The Court accordingly held that the claim for the estimated expenses in moving this machinery was not embraced within the statute and was properly disallowed by the trial court.

In the case of *Nashville Housing Authority v. Hill*, 497 S.W.2d 917 (1972), the Court of Appeals did allow expenses of dismantling and removing machinery and other incidental moving expenses in connection with the condemnation of a manufacturing plant, where the lessee had in fact incurred the expenses and had proven the amount thereof.

In the case of *Memphis Housing Authority v. Memphis Steam Laundry-Cleaners, Inc.*, 225 Tenn. 46, 463 S.W.2d 677 (1971), this Court construed the provisions of T.C.A. § 23–1414 and held that costs of moving fixtures and equipment in connection with the condemnation of a large commercial laundry were recoverable, and that it was not necessary that entry of judgment be deferred until possession of the property had been turned over to the state and the amount of the moving expenses had actually been incurred and ascertained. The Court said:

"The housing authority in its first assignment of error contends that the pay-

ment of moving expenses should not be required until after they have been actually incurred. This overlooks the provision that moving expenses are incidental damages. Such damages are to be paid along with the judgment for the taking and cannot be deferred until the cost of removal has been incurred. This assignment of error is overruled." 225 Tenn. at 53, 463 S.W.2d at 680.

■ It is apparent from these cases that the Tennessee statute permits recovery only of moving expenses which have actually been incurred at the date of the trial or which can be shown by testimony to be reasonably necessary in the future and which can be accurately estimated by such testimony.

In the present case, respondent offered testimony as to what it would have cost to remove the inventory on hand at the date of the taking, but at the same time his proof showed that he did not incur these expenses, except for approximately $2500, expended in removing the remnants of the inventory "right at the last." One of the purchasers of the inventory did testify that respondent removed some of the lumber which was purchased by this witness, but the amount of expense incurred by the respondent in doing so is not shown in the record. Had this been shown, or if it can be shown at the new trial, this item of expense would be recoverable, in our opinion, under the provisions of T.C.A. § 23–1414.

■ There is simply no provision in the statute, however, for loss of profits incurred upon the liquidation of an inventory, whether the liquidation be voluntary or involuntary. Nor is there any provision for the recovery of moving expenses to be incurred in the future, unless the amount of these and the reasonable necessity therefor can be shown by the evidence. In the present case respondent had a statutory right to move his inventory and recover the reasonable cost thereof, had he seen fit to do so. Instead, however, he chose to sell the inventory to others, and did not in fact incur more than a fraction of what the moving cost otherwise would have been.

A similar situation was presented to the Supreme Court of Nebraska in the case of *Bickels v. State*, 178 Neb. 825, 135 N.W.2d 872 (1965). There the owners of a grocery business were forced to move their business and suspend what had been a profitable operation, by reason of an eminent domain proceeding. They sold the stock of goods by discount sales in the ordinary course of trade or by making quantity sales to other grocers. They then sold their fixtures on the site. Under a statute permitting recovery of "the reasonable cost of any necessary removal of personal property from the real estate being taken . . .", the condemnees sought a jury instruction permitting allowance of removal costs. Commenting on this claim, the Court said:

"Appellants complain of the refusal of a tendered instruction which would have permitted the allowance of the costs of removal if the jury found the stock and fixtures were in the premises on the date of condemnation, regardless of whether any removal expense was incurred. We suggest that the statute permits the recovery of the cost of any *necessary* removal of personal property from the real estate being taken. Certainly, if the personal property is sold in such manner that the condemnee incurs no expense in its removal, it is hard to understand on what basis he should be compensated. In appellants' case the bulk of the merchandise was sold through regular trade channels. The hard-to-move items were sold to other grocers, and were delivered by the appellants themselves to the purchasers. There is, however, no evidence in this record on the cost of these deliveries. If such expenses were proved, they would be recoverable. The fixtures, except for the dairy case, were sold on the premises and were moved by the purchasers." 135 N.W.2d at 872, 875.

We believe that the principles announced in this case and in the Tennessee cases

above discussed are controlling here, and that the trial judge was in error in permitting evidence to be considered by the jury as to estimated removal costs which were never actually incurred and which in fact will never be incurred. Further, the trial court should not have permitted introduction of testimony as to the alleged loss of profits from the liquidation of the inventory.[3] No evidence along either of these lines will be permitted upon the retrial of this case. Respondent should, however, be permitted to prove the amount actually expended by him in the removal of inventory, including that sold to the purchasers, if such evidence is available and the amounts can reasonably be ascertained.

The judgment of the Court of Appeals, as modified herein, is affirmed, and the cause is remanded to the trial court for a new trial as to the issue of moving expenses only. Costs incident to the appeal will be taxed equally to the parties, as ordered by the Court of Appeals, and costs in the trial court will abide the result there.

FONES, C. J., and COOPER, BROCK and HENRY, JJ., concur.

---

**3.** See also *Bothwell v. United States*, 254 U.S. 231, 41 S.Ct. 74, 65 L.Ed. 238 (1920), disallowing losses from alleged forced sale of cattle resulting from condemnation proceedings.